FILED

**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ALABAMA**
**NORTHEASTERN DIVISION**

98 JUL 29 PM 12: 34

U.S. DISTRICT COURT
N.D. OF ALABAMA

| | | |
|---|---|---|
| RAYMOND MITCHELL, | ) | |
| PLAINTIFF, | ) | |
| VS. | ) | CV97-H-1134-NE |
| USBI COMPANY, | ) | |
| DEFENDANT. | ) | |

**ENTERED**

**JUL 2 9 1998**

### MEMORANDUM OF DECISION

The court has before it the May 27, 1998 motion for summary judgment filed by defendant USBI Company ("USBI"). Pursuant to the court's June 16, 1998 order, the motion was deemed submitted for decision, without oral argument, as of July 16, 1998.

In moving for summary judgment, defendant asserts that plaintiff has failed to establish a *prima facie* case of discrimination and that even if plaintiff can establish a *prima facie* case, the plaintiff cannot present evidence sufficient to demonstrate that USBI's articulated reason for plaintiff's termination was pretext for age discrimination. In support of its motion for summary judgment, defendant filed a brief on July 2, 1998 and an evidentiary submission[1] on June 11, 1998. In

---

[1]The defendant's evidentiary submission consists of the affidavits of G. Hossein Borhani, L. Roger Elliott, Garry R.

opposition to the motion for summary judgment, plaintiff filed a brief on July 16, 1998 and an evidentiary submission on July 9, 1998.[2]

Plaintiff filed his complaint on May 6, 1997 alleging that defendant laid him off because of his age in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §621 *et. seq.* In the complaint plaintiff alleges that plaintiff was terminated as part of a reduction-in-force while younger less-qualified employees were retained and that defendant failed to follow its layoff policy in implementing the reduction-in-force.

### Summary Judgment Standard

Under Fed. R. Civ. P. 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."

---

Moatts, Donald K. Reed, Thomas Kenneth Wilson and Louis Trivet and deposition excerpts from Pete Wunsch, Ed Liverett, Louis Trivett and the plaintiff.

[2]The plaintiff's evidentiary submission consists of the depositions of Louis Trivett and the plaintiff and excerpts from the depositions of Dale Dugal, Ed Liverett, Pete Wunsch, Vidya Reddy, William Wilkinson, Jr. and Bob Spencer, performance evaluations of plaintiff, the EEOC charge and employee appeals by plaintiff.

See Celotex Corp.. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548,
91 L. Ed. 2d 265 (1986). The party asking for summary judgment
always bears the initial responsibility of informing the court of
the basis for its motion, and identifying those portions of the
pleadings, depositions, answers to interrogatories and admissions
on file, together with affidavits, if any, which it believes
demonstrate the absence of a genuine issue of material fact.
Celotex, 477 U.S. at 323. Once the moving party has met his
burden, Rule 56(e) requires the nonmoving party to go beyond the
pleadings and by his own affidavits, or by the depositions,
answers to interrogatories, and admissions of file, designate
specific facts showing that there is a genuine issue for trial.
Celotex, 477 U.S. at 324. The substantive law will identify
which facts are material and which are irrelevant. Anderson v.
Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L.
Ed. 2d 202 (1986). All reasonable doubts about the facts and all
justifiable inferences are resolved in favor of the non-movant.
Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115 (11th Cir.
1993). A dispute is genuine "if the evidence is such that a
reasonable jury could return a verdict for the nonmoving party."
Anderson, 477 U.S. at 248. If the evidence is merely colorable,
or is not significantly probative, summary judgment may be

3

granted.  Id. at 249.

The method used by the party moving for summary judgment to discharge its initial burden depends on whether that party bears the burden of proof on the issue at trial.  See Fitzpatrick, 2 F.3d at 1115-17 (citing United States v. Four Parcels of Real Property, 941 F.2d 1428 (11th Cir. 1991) (en banc)).

If the moving party bears the burden of proof at trial, then it can only meet its initial burden on summary judgment by coming forward with positive evidence demonstrating the absence of a genuine issue of material fact; i.e. facts that would entitle it to a directed verdict if not controverted at trial.  Fitzpatrick, 2 F.3d at 1115.  If the moving party makes such a showing, the burden shifts to the non-moving party to produce significant, probative evidence demonstrating a genuine issue for trial.

If the moving party does not bear the burden of proof at trial, it can satisfy its initial burden on summary judgment in either of two ways.  First, the moving party may produce affirmative evidence negating a material fact, thus demonstrating that the non-moving party will be unable to prove its case at trial.  If the moving party satisfies its burden using this method, the non-moving party must respond with positive evidence sufficient to resist a motion for directed verdict at trial.  The

4

second method by which the moving party who does not bear the burden of proof at trial can satisfy its initial burden on summary judgment is to <u>affirmatively</u> show the absence of evidence in the record to support a judgment for the non-moving party on the issue in question. This method requires more than a simple statement that the non-moving party cannot meet its burden at trial but does not require evidence negating the non-movant's claim; it simply requires the movant to point out to the district court that there is an absence of evidence to support the non-moving party's case. <u>Fitzpatrick</u>, 2 F.3d at 1115-16. The affirmative showing may be accomplished by reference to any combination of the following: pleadings; deposition testimony of a party or its witness; affidavits; responses to interrogatories or failure to respond to interrogatories; requests for admission and responses thereto; and other exchanges between the parties that are in the record. <u>See</u> <u>Clark v. Coats & Clark, Inc.</u>, 929 F.2d 604 (11th Cir. 1991); <u>see also</u> <u>Celotex</u>, 477 U.S. at 332 (Brennan, J., dissenting). If the movant meets its initial burden by using this second method, the non-moving party may either point out to the court record evidence, overlooked or ignored by the movant, sufficient to withstand a directed verdict, or the non-moving party may come forward with additional

evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency.

The Eleventh Circuit has stated that district courts should use caution when taking employment discrimination cases away from the trier of fact by means of summary judgment.  Isenbergh v. Knight-Ridder Newspaper Sales, Inc., 84 F.3d 1380, 1384 (11th Cir. 1996).  However, the Eleventh Circuit also recognizes that "[s]ummary judgments . . .are not rare in employment discrimination cases."  Earley v. Champion International Corp., 907 F.2d 1077, 1080 (11th Cir 1990).  "Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which is designated 'to secure the just, speedy and inexpensive determination of every action.'"  Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986) (quoting Fed.R.Civ.P. 1).  Given the ease of complying with the notice pleading requirements in asserting a discrimination claim, the Eleventh Circuit indicates to district courts that "plaintiffs seeking to avoid summary judgment should be strictly held to the requirements of Rule 56(e); the plaintiff must present specific non-conclusory facts that would support a jury verdict against the particular defendant on discriminatory intent."  Ratliff v. DeKalb County, 62 F.3d 338, 341 (11th Cir.

1995).

Where a plaintiff's discrimination claim is based on circumstantial evidence, the court employs the burden-shifting framework established in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).  First, the plaintiff has the burden of establishing a *prima facie* case of discrimination.[3]  Second, after plaintiff has presented a *prima facie* case, the burden of production shifts to the defendant, requiring an articulation of some "legitimate, nondiscriminatory reason" for the alleged discriminatory employment action.  Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 254 (1981).  "[I]t is possible for the defendant to present such strong evidence of a nondiscriminatory rationale that summary judgment is warranted."  Brown v. American Honda Motor Co., Inc., 939 F.2d 946, 950 (11th Cir. 1991), cert. denied, 502 U.S. 1058 (1992) (quoting Grigsby

---

[3] In order to present a *prima facie* case of discrimination, plaintiff must show:   (1) that he or she belongs to a protected class; (2) that he or she either applied and was qualified for a position for which the employer was seeking applicants or was satisfactorily performing the duties of the job; (3) that he or she was rejected or terminated; and (4) that, after the rejection, the position remained open and the employer continued to seek applicants for persons of plaintiff's qualifications. McDonnell Douglas, 411 U.S. at 802.  Based on O'Connor v. Consolidated Coin Caterers Corp., ____ U.S. ____, 116 S.Ct. 1307, 1310 (1996), plaintiff need not show that the position at issue was filled by a person outside the protected class.

7

v. Reynolds Metals Co., 821 F.2d 590, 596 (11th Cir. 1987)).

Once the defendant presents legitimate, nondiscriminatory reasons for its action, then the plaintiff must prove by a preponderance of the evidence that the reasons offered by the defendant are a mere pretext for discrimination, and to persuade the fact-finder that the defendant intentionally discriminated against the plaintiff. McDonnell Douglas, 411 U.S. at 804. In other words, "[a]fter a Title VII plaintiff makes out a prima facie case, and the defendant produces a legitimate nondiscriminatory explanation for its actions, the McDonnell-Burdine presumption drops from the case. At that point, the inquiry is whether the defendant intentionally discriminated against the plaintiff." Harris v. Shelby County Board of Education, 99 F.3d 1078, 1083 (11th Cir. 1996).

"[B]ecause the plaintiff bears the burden of establishing pretext [for discrimination], he must present 'significantly probative' evidence on the issue to avoid summary judgment." Isenbergh v. Knight-Ridder Newspaper Sales, Inc., 97 F.3d 436, 444 (11th Cir. 1996) (quoting Young v. General Foods Corp., 840 F.2d 825, 829 (11th Cir. 1988) (other citations omitted) (alterations in original). "At the summary judgment stage, once an employer articulates a legitimate, nondiscriminatory reason

8

for the discharge, the burden shifts back to plaintiff to raise a genuine factual question as to whether the stated reason is mere pretext." Cortin v. Southland Int'l Trucks, 25 F.3d 1545, 1550 (11th Cir. 1994); Hairston v. Gainesville Sun Publ. Co., 9 F.3d 913, 920 (11th Cir. 1993).

Plaintiff may prove that the defendant intentionally discriminated against him either "directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy or credence." Carter v. City of Miami, 870 F.2d 578, 584 (11th Cir. 1989). "If the defendant's proffer of credible, nondiscriminatory reasons for its actions is sufficiently probative, then the plaintiff must come forward with specific evidence demonstrating that the reasons given by defendant were a pretext for discrimination." Brown, 939 F.2d at 950. "Conclusory allegations of discrimination, without more, are not sufficient to raise an inference of pretext or intentional discrimination where [a defendant] has offered extensive evidence of legitimate, non-discriminatory reasons for its actions." Isenbergh, 97 F.3d at 444 (quoting Young, 840 F.2d at 830).

The following facts in this case are undisputed or where
disputed are viewed in light most favorable to the plaintiff.
Defendant USBI, a space industry contractor headquartered at
Kennedy Space Center in Florida, does work as a contractor for
NASA in connection with the Space Shuttle program.  See Pretrial
Order, Agreed Summary p. 2; Trivett depo. p. 145.  USBI conducts
certain operations in Huntsville, Alabama, where its workforce
numbers approximately 45 to 50 employees.  See Trivett depo. pp.
143-144.

    Plaintiff began working for USBI in Huntsville on or about
July 21, 1981.  See complaint ¶4.  According to plaintiff, in
1985, he transferred into the Engineering Department, where he
worked until his termination on November 5, 1993.  See Mitchell
depo. p. 48.  Plaintiff was 57 years old at the time of his
termination.  See complaint ¶4.  During his tenure in the
Engineering Department, plaintiff was classified as a "Senior
Systems Engineer" and his duties included the maintenance of
several specific documents.   See Mitchell depo. pp. 87, 145-153;
Trivett depo. pp. 42, 88-89.  Plaintiff's duties included
updating documents by physically assembling changes as directed
by someone working on a particular subsystem.  See Mitchell depo.
pp. 205-208.  In his deposition, plaintiff characterized at least

10

part of his job as "paper shuffling" and "purely administrative."
See id. at 209, 212.  Plaintiff's former supervisor, Ed Liverett,
stated that plaintiff had to have technical knowledge and that
his job was more than a secretarial or administrative type job.
See Liverett depo. p. 27.

By 1993, USBI's Huntsville workforce had been reduced from
750 employees to approximately 500 employees as a result of two
layoffs implemented in 1991 and 1992.  See Mitchell depo. p. 275;
Reed affidavit ¶4; exhibit 1 to Borhani affidavit.  Three hundred
of those employees worked in the Engineering Department.  See
Reed affidavit ¶4; exhibit 1 to Borhani affidavit.  As of early
fall 1993, USBI's Engineering Department was headed by Donald K.
Reed, the Vice-President of Engineering.  See Reed affidavit ¶3.
Four managers reported directly to Reed: Phillip R. Taylor, Chief
Engineer, Systems Engineering and Integration; Paul Wiggins,
Manager, Automated Test Equipment; L. Roger Elliott, Director,
Systems Design; and Frank A. Camaratta, Director, Materials and
Analysis.  See Reed affidavit ¶ 4; exhibit 1 to Reed affidavit.

Plaintiff worked in Systems Engineering and Integration,
Phillip Taylor's organization, or branch, and reported directly
to Alan Norwood, Chief of Systems Engineering & Ground Testing.
See Mitchell depo. pp. 440-441.  Norwood and another section

11

chief, Mark Feathers, the Chief of Systems Requirements &
Integration, reported to Lou Trivett, the Subsystems Manager for
Systems Integration. See exhibit 1 to Reed affidavit. Trivett
and six other managers, including Jerry Curry, the Subsystems
Manager for Flight Systems Assessment, reported to Phillip
Taylor. See id. Curry had two section chiefs who reported
directly to him, one of whom was Gary Moatts, Chief of Flight &
Test Engineering. See id.

Starting in 1976, USBI contracted with NASA to perform
engineering and systems integration on one of NASA's programs,
the "ASRB" program. See Reed affidavit ¶5. In 1993 due to the
discontinuance of ASRB by Congress, NASA canceled the ASRB
program USBI was working on and USBI was forced to implement the
November 5, 1993 reduction-in-force. See Reed affidavit ¶6.

In late October of 1993, Don Reed was informed by his
supervisors that the level of staffing in the Engineering
Department would have to be reduced by approximately 46 or 47
positions as a result of the cancellation of the ASRB program.
See Reed affidavit ¶7. This number represented the number of
"equivalent positions" in the Engineering Department that had
been funded under the ASRB program. See id. Many employees
worked on the ASRB program, but most spent only a share of their

12

total time on the program and the number of "equivalent
positions" was the total of all the employees' proportionate
shares of the ASRB work.  See id.  Reed instructed the managers
reporting directly to him to prepare lists of potential prospects
for layoff in their respective organizations.  See Reed affidavit
¶8.  Each manager was told how many positions in his organization
would be eliminated based on the number of "equivalent positions"
in his organization which had been funded under the ASRB program.
See id.  Each of those managers had each of their subordinate
managers consult with their section chiefs and come up with an
initial list of layoff candidates in their respective subgroups.
See id.  The initial lists of names typically were selected by
those subordinate managers and their section chiefs and submitted
back up the chain of command until the Engineering Department had
compiled a department-wide list of layoff prospects.  See id.

Once this department-wide list was compiled, the Engineering
Department managers worked with the Human Resources Department to
determine whether any of the employees on this list were entitled
to displace, or "bump," other employees.  See Reed affidavit ¶9.
Under USBI's written layoff policy, an employee initially slated
or recommended for the layoff could bump a less senior employee
in the same job classification or job family if the more senior

employee possessed the requisite qualifications of the less senior employee's job.  See id.  Lisa Murphy, a member of Reed's staff, obtained seniority information from the Human Resources Department and drew up a list to assist in the process of determining bumping rights.  See Reed affidavit ¶ 10.  The Engineering Department met several times and made decisions that revised the list before the final list of employees to be laid off was complete.  See id.  For each less senior employee retained over a more senior employee in the same job classification or family, the Engineering Department had to prepare a written report documenting the basis for the decision. See Reed affidavit ¶ 12.  The lower level managers typically prepared these reports which were then approved by the mid-level managers and reviewed and signed by Reed.  See id.

According to Lou Trivett, Manager of Systems Integration, he was told that approximately nine or ten employees would have to be reduced from his organization.  See Trivett depo. pp. 45-46. Trivett examined the job functions performed by each employee who worked for him and the qualifications that would be needed to perform the work that would remain after the discontinuance of the ASRB work.  See id. at 47.  Trivett consulted with the two section chiefs who reported directly to him about the requisite

14

skills and qualifications needed to perform the remaining work. See id. The employees who did not possess the qualifications became the initial candidates for layoff. See id. Trivett understood that the list would change with the implementation of the layoff policy regarding bumping. See id. at 47-48. According to Trivett, the Human Resources Department applied the bumping procedure. See id. at 65-65. Trivett submitted a list of nine or ten candidates for layoff to his boss, Phil Taylor. See id. at 55. According to Trivett, Mitchell and other employees were on the list because Trivett and his two supervisors determined that some of their job functions could be absorbed by other employees and some could be eliminated entirely. See id. at 56-57. Taylor incorporated Trivett's list into the list for his organization and submitted his list to Reed and then Taylor's list was incorporated into the department-wide list of layoff candidates. See Reed affidavit ¶ 8; exhibit 2 to Reed affidavit.

The Engineering Department worked with the Human Resources Department to determine whether plaintiff's seniority or the seniority of the other individuals on the list would entitle those employees to "bump" any employee in the same job classification or family. See Reed affidavit ¶¶ 9-10; exhibit 2

15

to Reed affidavit.  The supervisors of the employees who were potentially subject to being bumped by plaintiff determined whether plaintiff possessed the requisite qualifications to bump twenty less senior employees who worked in plaintiff's job classification or family.  See Elliott affidavit ¶¶ 6-9; Moatts affidavit ¶¶ 7-9; Trivett depo. pp. 79-122; exhibit 6 to Trivett depo.  USBI's management determined that plaintiff did not possess the requisite qualifications to bump any of the less senior employees.  See Elliott affidavit ¶¶ 8-9; exhibits 1 and 2 to Elliott affidavit; Moatts affidavit ¶¶ 8-9; exhibit 1 to Moatts affidavit; Trivett depo. pp. 79-122; exhibit 6 to Trivett depo.  Trivett and his section chief determined that plaintiff did not possess the requisite qualifications for the jobs held by seven of the twenty less senior employees whose jobs plaintiff was considered for under the bumping policy.  See Trivett depo. 79-122; exhibit 6 to Trivett depo.  Based on his own understanding of plaintiff's job responsibilities and on discussions with plaintiff's section chief Alan Norwood, section chief Gary Moatts determined that plaintiff did not have the requisite qualifications for the positions held by eleven of the twenty less senior employees in plaintiff's job classification. See Moatts affidavit ¶¶ 7-9; exhibit 1 to Moatts affidavit.

16

Roger Elliott and his supervisors determined that plaintiff was not qualified for two job positions for the remaining two less senior employees for whose jobs plaintiff was considered. See Elliott affidavit ¶¶ 7-9; exhibits 1-2 to Elliott affidavit.

During the early stages of the bumping review process, the Engineering Department managers and the Human Resources Department discussed whether the most recent performance evaluations - those done in the spring of 1993 for the year 1992 - should be considered during the bumping process. See Reed affidavit ¶ 13. The department discussed whether a less senior employee who possessed the requisite skills should be retained over a more senior employee if, on the most recent performance evaluation, the less senior employee had received a rating two or more grades higher than the more senior employee. See id. Prior to the implementation of the layoff, the Human Resources Department decided that such a two-grade variance in the performance evaluations would not, in and of itself, be grounds for retaining the less senior employee. See id. The Engineering Department ultimately did not use the two-grade performance variance as a basis to preclude any employee from bumping a less senior employee. See id; Trivett depo. p. 70. On November 5, 1993, plaintiff and the other employees on the final list were

17

informed of their termination.   See Mitchell depo. pp. 279-281.

The average age of all employees in the Engineering Department prior to the layoff was 41.80 years and the average age of the employees after the layoff was 41.72 years.   See Reed affidavit ¶ 14.   The average age of the employees within Lou Trivett's group was between 42 and 43 years, both before and after the layoff.   See Trivett affidavit ¶ 5.   G. Hossein Borhani, an independent labor economist and econometrician, analyzed the statistical data relating to USBI's layoff and found that within the Engineering Department, 14.77% of those age 40 or over were laid off in the November 5, 1993 reduction, compared to 14.57% of those under the age of 40.   See exhibit 1 to Borhani affidavit.   According to Borhani, the results of his analysis demonstrate that USBI's reduction-in-force decisions were not related to age.   See id.

On January 26, 1994, plaintiff filed an EEOC charge alleging age discrimination in the termination of his employment.   See plaintiff's exhibit 10.   Plaintiff filed a complaint in this case on May 6, 1997.

Defendant argues that plaintiff is unable to offer any direct evidence of discrimination upon which to establish his claim that USBI selected him for layoff because of his age.

18

Plaintiff concedes in his brief that there is no direct evidence of discrimination.  See plaintiff's brief p. 12, n. 3.

Defendant next argues that plaintiff has failed to prove a *prima facie* case of age discrimination because he has not presented sufficient evidence that he was qualified for any of the jobs remaining at USBI after the layoff.  In order to establish a *prima facie* case in a reduction-in-force case, the plaintiff must establish "(1) that he was in a protected age group and was adversely affected by an employment decision; (2) that he was qualified for his current position or to assume another position at the time of discharge or demotion; and (3) evidence by which a fact finder might reasonably conclude that the employer intended to discriminate on the basis of age in reaching the decision at issue."  Early v. Champion International Corp., 907 F.2d 1077, 1082 (11th Cir. 1987) (citations omitted). Plaintiff argues that he has established a *prima facie* case of age discrimination because plaintiff was 57 years old at the time of the layoff, because nineteen of the twenty employees retained were younger than him and because he was more than qualified to perform many of remaining positions at USBI.  As evidence of his qualifications, plaintiff offers the testimony of his former

19

supervisor who was not employed with USBI at the time of the layoff and the testimony of former co-employees of plaintiff, some of whom were also laid off in November of 1993. See plaintiff's excerpts of depos. of Liverett, Dugal, Reddy and Spencer. While the court has some doubt that a *prima facie* case has been established, the court will assume that plaintiff has established a *prima facie* case.

The defendant next argues that even assuming that plaintiff can make out a *prima facie* case of age discrimination, summary judgment is still due in USBI's favor because USBI has articulated a legitimate reason for its decision to select plaintiff for the layoff and plaintiff cannot present evidence to establish that this articulated reason is pretext for discrimination. USBI's reason that plaintiff was selected for the layoff is that management determined that plaintiff did not possess the requisite qualifications for the work that remained after the cancellation of the ASRB program. Through the process detailed earlier in this opinion, USBI's management determined that plaintiff did not possess the requisite qualifications or skills to bump any of the less senior employees who were ultimately retained. The Eleventh Circuit has held that a

20

disagreement with an employer's business judgment is not evidence of discrimination.  See Elrod v. Sears, Roebuck & Co., 939 F.2d 1466, 1470 (11th Cir. 1991).  "Federal Courts do not sit as a super-personnel department that reexamines an entity's business decisions.  No matter how medieval a firm's practices, no matter how high-handed its decisional process, no matter how mistaken the firm managers, the ADEA does not interfere.  Rather, [the] inquiry is limited to whether the employer gave an honest explanation of its behavior."  Elrod, 939 F.2d at 1470 (citations omitted).  "[A] plaintiff may not establish that an employer's proffered reason is pretextual merely by questioning the wisdom of the employer's reason, at least not where ... the reason is one that might motivate a reasonable employer."  Combs v. Meadowcraft, Inc., 106 F.3d 1519, 1543.  Defendant has explained the detailed and careful process that led to plaintiff's layoff and that the undisputed evidence demonstrates that age was not a consideration in this process because the average age of all employees in the Engineering Department prior to layoff was 41.80 years and the average age of the employees after the layoff was 41.72 years.

Plaintiff argues that a jury could infer that USBI's stated reason is pretext because the stated reason does not, under the

facts, make good sense.  "The district court must evaluate whether the plaintiff has demonstrated 'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered reasons for its action that a reasonable factfinder could find them unworthy of credence.'"  Combs, 106 F.3d at 1538 (citations omitted).  As evidence of such inconsistencies,[4] plaintiff argues that USBI failed to follow its written layoff policy[5] because it failed to remove the employees who were working primarily on the ASRB project, the work that was eliminated.  Plaintiff argues that Trivett failed to include some employees who were working on the ASRB project on his initial list of layoff prospects.  Assuming that the layoff policy was properly interpreted to operate as plaintiff suggests, there is no evidence that Trivett failed to follow the policy because he was acting out of any sort of age

---

[4]Plaintiff notes that a former employee, Pete Wunsch, stated that he assumed something other than technical aspects played into the decision.  However, the opinion of a former employee without more does not amount to evidence of an inconsistency or factor demonstrating the implausibility of the reason USBI gave for laying off plaintiff.

[5]USBI's written layoff policy states, in Section II, E.: "Employees within the department who perform the work that is being eliminated will be the first to be removed from their jobs."  See defendant's exhibit 12 to Mitchell depo.

22

animus.  Trivett explained in his deposition how he came up with
the initial list of prospects and to the extent that this was
inconsistent with the dictates of USBI's policy, defendant argues
that Trivett made an honest mistake.  At least two circuits have
found that an inference of discrimination cannot be drawn simply
because the employer may have violated its internal company
policy in taking an employment action.  See E.E.O.C. v. Texas
Instruments, Inc., 100 F.3d 1173, 1182 (5th Cir. 1996); Friedel
v. City of Madison, 832 F.2d 965, 973 (7th Cir. 1987).  Citing
this case law, defendant argues that the issue in this case is
whether there is any evidence of discrimination against the
plaintiff because of his age and not whether the employer somehow
strayed from its internal policy. Plaintiff acknowledges that
USBI's failure to follow the internal policy is not in and of
itself, age discrimination, but argues that it may create an
inference for a jury to conclude that the company's asserted
reasons are not the actual reasons for their actions.  Although
the failure to follow internal policy could be evidence of
pretext, it is not sufficient to create a genuine issue of
material fact, especially in light of the defendant's offered
evidence.  Defendant points out and the court notes that if
plaintiff could establish that USBI's failure to follow its

layoff policy adversely affected its older employees, then perhaps an inference of discrimination could be drawn from such failure. However, plaintiff has produced no evidence demonstrating that there was an adverse impact on USBI's older employees. The average age of the employees in the Engineering Department prior to the layoff was 41.80 years, compared to 41.72 years after the layoff. See Reed affidavit ¶ 14. Hossein Borhani, an independent labor economist, determined that at the time of the layoff 149 of the 300 employees in the Engineering Department were 40 years of age or older and 151 were under 40 years of age.[6] See exhibit 1 to Borhani affidavit. Out of the group of 300 employees, 22 of the 149 employees age 40 or older (14.77%) were laid off, while 22 of the 151 employees under 40 years old (14.47%) were laid off. See id. The court is satisfied that an employer's failure to adhere to an internal policy does not establish pretext or raise an inference of

_____

[6]Plaintiff argues that an examination of the age of the individuals in the Systems Engineering Department leads to a different conclusion than the one reached by Borhani. Plaintiff states that six of the seven individuals selected for termination were over forty years of age; however plaintiff gives no reason why the court should discredit the report from the Borhani, other than calling Borhani "a purported statistical expert." The court is satisfied that the report of Borhani is valid and that plaintiff has produced no evidence to call into question the results of his report.

discrimination when there is no evidence that such failure was motivated by age and when there is no evidence that it had any discriminatory impact on older employees.

Plaintiff also argues that USBI's articulated reason is pretext for age discrimination because there is substantial evidence that he was more qualified for multiple positions which were retained by younger employees and that defendant's business decision that plaintiff did not hold qualifications for the positions held by any of the nineteen younger individuals is "simply incredible."  However, plaintiff's "substantial evidence" consists of testimony from a former supervisor, former employees and plaintiff himself.  <u>See</u> plaintiff's excerpts of depos. of Dugal, Liverett, Reddy, Spencer and Mitchell.  Once again, apart from the requirements of Rule 602 of the Federal Rules of Evidence, the court doubts how this testimony constitutes "substantial evidence" that plaintiff was more qualified than those employees retained; however, that is not the material issue in this case.  The issue is not whether plaintiff actually possessed the requisite qualifications to perform those jobs but, rather, whether USBI management refused to allow plaintiff to bump the employees in those jobs, knowing that he did, in fact, possess those qualifications.  That is, the plaintiff must

produce evidence establishing that the employer's decisions were not made in good faith.  See Elrod, 939 F.2d at 1470; Smith v. Horner, 839 F.2d 1530, 1538 (11th Cir. 1988).  The evidence plaintiff produces that he had the requisite qualifications to perform those jobs is at most a difference of opinion about plaintiff's abilities and the plaintiff has failed to put forth any evidence tending to show that the managers actually involved in the decision not to retain plaintiff did not truly believe that plaintiff lacked the requisite qualifications for the remaining positions or that those managers were in any way motivated by age.  Furthermore, plaintiff's bald assertion that defendant's business decision is "simply incredible" does not establish that the defendant's proffered reason was pretext for age discrimination.

Plaintiff next argues that background evidence tending to show age discrimination in the corporate culture of USBI was the real reason for the decision to include plaintiff in the layoff.  According to plaintiff, on multiple occasions, one of the highest ranking officials in the company was heard to make ageist comments.  During the late 1980's and early 1990's, Frank Batty was employed at USBI as head of program management and on multiple occasions made negative comments about older engineers.

26

See Wunsch depo. pp. 14-20.  According to Pete Wunsch, a former co-employee of plaintiff, Batty commented that USBI needed to get rid of the old fossils with calcified brains and get some new blood in the organization.  See id.  Wunsch believes that Batty's comments were overheard by Trivett, plaintiff's supervisor at the time of his layoff.  See id. at 18.  Wunsch testified that the comments were made in a joking manner, but stated that as an older employee he took the comments seriously.  See id. at 14, 19.  Plaintiff testified in his deposition that Jack Roach, another former USBI manager, "always called me old man."  See Mitchell depo. pp. 409-410.  Plaintiff concedes that these comments were not made by a decision-maker in this case but argues that these comments are evidence of the corporate culture and attitude toward older employees at USBI.  Evidence of this nature is probably not relevant under FRE 402 and arguably should be precluded under FRE 403; however, since this case is at the summary judgment stage, the court will not only assume that the evidence is relevant and not precluded under FRE 403, the court will assume the truth of the evidence.  Even assuming that these comments were made, the evidence is simply not enough to place at issue the intent of the USBI managers, the decision-makers involved in the layoff.  Plaintiff argues that the comments are

27

evidence of pretext because Batty's comments were made in meetings which included many of the supervisors and managers in the Engineering Department, including some of the managers who made the decision regarding plaintiff.  Plaintiff offers no evidence of ageist comments made by the decision-makers in plaintiff's case and no evidence that the ageist comments made by Batty or Roach were a part of USBI's company-wide policy. Plaintiff also offers no evidence that these comments were in any way related to the challenged employment decision in this case. These isolated and stray comments were made prior to November of 1993 by individuals who took no part in the layoff decision and as such fall short of constituting evidence of pretext. Statements by nondecision-makers do not constitute direct evidence of discriminatory intent and the court is satisfied that these comments offered as evidence of pretext, either standing alone or viewed in light of all the evidence, do not "raise a genuine factual question as to whether the stated reason is mere pretext." Cortin, *supra* at 1550.[7]

---

[7]Plaintiff also offers as evidence of pretext the testimony of Robert Spencer, another USBI employee laid off in November of 1993.  Spencer stated in his deposition that Ken Wilson, the unit chief who reported to plaintiff's supervisor, Alan Norwood, informed him apologetically that USBI was laying off people who were more financially secure as opposed to those with young

Plaintiff also argues that the testimony of Ed Liverett,

plaintiff's former supervisor, demonstrates pretext.   Liverett

testified that it was his own practice to give higher ratings to

the younger, lower-paid employees so that they would get bigger

raises than the raises awarded to the older employees.   See

Liverett depo. p. 38.   Liverett thought this was the logical

thing to do in order to keep the younger employees satisfied and

it never occurred to him that this practice was motivated by age

bias.   See id. at 43-46, 49.   According to plaintiff, Liverett

told him on three occasions - in 1989, 1990, and 1991 - that

Liverett wanted to give him a higher rating on the annual

---

children in school.   See Spencer depo. pp. 65-66.   The court
notes that as older individuals are just as capable of having
young children in school and having mortgages as are younger
individuals and as there are numerous young individuals who have
no young children in school and have no mortgages, Wilson's
comment is not significantly probative of age discrimination.
There is nothing in Spencer's statement demonstrating that he had
personal knowledge of Wilson's supervisory capacity or knowledge
of Wilson's role in the decisions regarding the November of 1993
layoff.   Wilson stated in an affidavit submitted to this court
that he was not a supervisory employee at the time of the
November 1993 layoff and he had no decision-making role in the
layoff.   See Wilson affidavit ¶¶ 3-4.   Even assuming that Wilson
made the comments to Spencer, because Wilson was not involved in
the November of 1993 layoff, his comments are not enough to place
at issue the intent of the USBI managers who were the actual
decision-makers and the comments do not raise a genuine factual
question as to whether USBI's articulated reason is pretext.
Defendant's July 28, 1998 motion to strike the testimony of
Robert Spencer will be denied.

performance evaluation but that he had been forced to reduce his rating in order to comply with a higher supervisor's instructions that the ratings be assigned on a bell curve. See Mitchell depo. pp. 419-421. In this lawsuit, plaintiff challenges only the decision to include him in the November 1993 layoff and he does not challenge the 1989, 1990 and 1991 performance evaluations. Plaintiff argues that employee evaluations played a role in the decision-making process for the layoff and that had plaintiff received evaluation scores representative of his performance, the decision-makers may have determined that he had the requisite qualifications to bump one of the less senior employees. Although the paperwork relating to the bumping review may have references to certain employees not being bumped because of their performance ratings, the Human Resources Department decided not to use the performance reviews in the bumping procedure. See Reed affidavit ¶ 13. Plaintiff's attempt to connect Liverett's testimony to his inclusion in the list for the layoff fails and plaintiff offers no evidence to discredit the testimony of Reed that the performance evaluations were not used in determining who would be on the layoff list. Furthermore, the testimony of Liverett includes information about performance reviews done prior to 1992, when Liverett ended his employment with USBI.

There is no evidence to suggest that the USBI management considered any review completed prior to Spring of 1993.  The reviews referenced in the bumping paperwork were those reviews for the year 1992, which were completed in Spring of 1993.  See Reed affidavit ¶ 13.  Therefore Liverett's testimony concerning his practice of lowering reviews in the past has no connection to USBI's decision to include plaintiff in the November 1993 layoff.

The court is satisfied that there is no genuine issue of material fact and that plaintiff has failed to set forth evidence sufficient to withstand the motion for summary judgment filed by the defendant.  That motion as to all claims by plaintiff is due to be granted.  A separate final order will be entered.

DONE this _29th_ day of July, 1998.

SENIOR UNITED STATES DISTRICT JUDGE

31